UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE № 16-20461-CR-MARTINEZ

UNITED STATES OF AMERICA,

    *Plaintiff*,

v.

ADRIANA JALIL,

    *Defendant*.

_____/

## SENTENCING MEMORANDUM AND INCORPORATED MEMORANDUM OF LAW

The Defendant, **ADRIANA JALIL**, through her undersigned counsel, respectfully submits this Sentencing Memorandum, pursuant 18 U.S.C. § 3553(a), and the dictates of *United States v. Booker*, 543 U.S. 220 (2005) and its protégées. In support hereof, **Ms. JALIL** submits the following:

### INTRODUCTION

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue. *Pepper v. United States*, 562 U.S. 476, 487 (2011); (emphasis added).

[H]ighly relevant – if not essential – to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics. *Pepper*, 562 U.S. 476, 488 (2011) (citing *Williams v. New York*, 337 U.S. 241, 247 (1949). Consideration of the widest breath of information ensures that the punishment will suit not merely the offense but the individual defendant. *Id*; (citing *Wasman v. United States*, 468 U.S. 559, 564 (1984). **MS. JALIL** is a woman who has

spent the majority of her life taking care of others at the expense of her own well-being. We urge the Court to give fair and due consideration to **MS. JALIL'S** many positive personality traits and characteristics that weigh heavily in favor of a variance in this case.

## I.
### HISTORY AND CHARACTERISTICS

**MS. JALIL** is a sixty-six (66) year old woman who has led a very difficult and lonely life – often times left to battle life's obstacles on her own.  She is one of four (4) children born to Domino Longo and Cira Faz in Havana, Cuba.  Her father was an alcoholic who became extremely violent and aggressive towards his family when he drank, which was often.  He never played an active role in her life.  When **MS. JALIL** was just eight (8) years old, her father abandoned his family to make a better life for himself in the United States. After her father left, **MS. JALIL** helped her mother with the responsibilities of the household and played a tremendous role in the upbringing of her two (2) younger siblings – the oldest sibling chose not to contribute to the family.  Till this day, **MS. JALIL** is the only child who is preoccupied with the well-being of her ninety-two (92) year old mother who suffers from a plethora of infirmities and she continues to provide support to her younger sister in Cuba.

In 1968, it was arranged that **MS. JALIL** would marry Louis Marcelo Pedre (hereinafter "Mr. Pedre"), a native from Cuba who was living in Yonkers, New York, via postal mail.  Prior to their marriage, **MS. JALIL** had never met nor spoken to Mr. Pedre; she was given no choice in the matter.  In 1970, just two (2) years after the marriage, the couple divorced because **MS. JALIL** could not immigrate to the United States.  Soon thereafter, **MS. JALIL** met her current husband, Jose Jalil (hereinafter "Mr. Jalil").

Mr. Jalil swept **Ms. Jalil** off her feet. After twenty (20) years of having to take care of everyone else, **Ms. Jalil** finally met someone that made her their priority and promised to always take care of her and their family. On May 16, 1971, they married in Cuba and eventually immigrated to the United States. Together they have two (2) children, Jose Yamil Jalil, age forty-three (43) and Adriana Caridad Jalil, age thirty-eight (38).

Once married, **Ms. Jalil** began to discover that the loving, committed, and trustworthy husband and father that Mr. Jalil held himself out to be was just a façade. Mr. Jalil's true self slowly unfolded. It started with Mr. Jalil demanding that **Ms. Jalil** be at his every "beck and call." Mr. Jalil's demands included: cleaning "his house"; doing his laundry and ironing his clothes; cooking all his meals; laying out his clothes; and packing his suitcases. **Ms. Jalil** was required to do all of her "chores" regardless of what errands and or responsibilities she needed to take care of for herself or their children. Mr. Jalil never allowed **Ms. Jalil's** name to be on their marital home or the bank accounts – he used this as leverage against her by threatening to leave **Ms. Jalil** on the streets with nothing if she ever tried to disobey him or leave.

Mr. Jalil never helped with the upbringing of their children and played little to no role in their lives. Apart from taking care of their children and serving her husband, **Ms. Jalil** had to work as a certified nursing assistant (hereinafter "CNA") because the "allowance" she was given by her husband was insufficient to cover all of their children's necessities. She also needed to send money to Cuba to care for her sick mother and sister.

In the early 2000s, a friend of **Ms. Jalil** told her that Mr. Jalil was having an affair with a woman for whom he had just purchased an office, a house just blocks away from

Law Offices of Samuel J. Rabin, Jr., P.A. • 800 Brickell Avenue, Suite 1400, Miami, FL 33131 • Telephone (305) 358-1064

**MS. JALIL** and their children, a luxury car; and he also financed her cosmetic surgery. **MS. JALIL** was in disbelief – here she was struggling to support her family and her husband was having an affair and spending all his money on the other woman instead of his children. **MS. JALIL** went to the woman's office and asked the woman whether she knew Mr. Jalil. The other woman responded that Mr. Jalil was her husband. Later on, **MS. JALIL** drove to the house that Mr. Jalil had purchased for the other woman and saw her husband's car parked in front of the house. She confronted her husband and the other woman and confirmed that all that she had been told was true. However, when **MS. JALIL** tried to leave her husband, he once again threatened to leave her and their children homeless if she went through with her threats. Although Mr. Jalil was openly having an affair, he still demanded **MS. JALIL** wait on him "hand and foot" and she complied out of fear that he would leave her and her children on the streets with nothing. **MS. JALIL** was once again left alone to take care of her family.

In 2004, Mr. Jalil moved to Panama to start a new life with a young woman. However, every time Mr. Jalil visits Miami he stays at the marital home and expects **MS. JALIL** to serve him. He still threatens to leave her on the streets if she does not tend to his "needs." Since his move to Panama, the only financial support that he has provided to his wife and family is payment of the mortgage. However, he recently built a mansion in Panama for him and his new family. It is rumored that he lives a very lavish life.

Despite all the issues in her marriage, **MS. JALIL** was and still is an extraordinary mother who serves as her children's main pillar of support. **MS. JALIL** shielded her children from their father's deplorable behavior and only spoke well about him in front of them. She never wanted them to be apprised of his selfishness and aloof attitude towards

them.  She would always pick them up from school and help them in any way that they needed with a smile on her face.  She never complained or showed her true emotions and she never asked for help.  If they needed money for school or extracurricular activities she worked extra hours without hesitation.  To this day, **Ms. JALIL** continues to shelter her children from their father's true character.  She never wants them to feel the sense of abandonment she felt when her father left.  Moreover, although her children know about her current legal situation, she has tried to tell them as little as possible because she says that she wants them to focus on their life and does not want to "burden" them with her troubles.  She has always put her children's needs before her own.

In 2016, **Ms. JALIL** was granted temporary custody of her two grandchildren, Joselina Jalil, age twelve (12) and Angelica Jalil, age nine (9), while her son, Jose Jalil (hereinafter "Jose"), sought work in Colorado.  In 2011, with the financial and emotional support of his mother, Jose was granted full custody of his two (2) girls.  His ex-wife and the mother of his children, Yadelkis Fonseca, had been neglecting the girls and abusing them.  She eventually abandoned the girls on the side of the street.  The girls were found to be filthy and severely malnourished.  The youngest daughter has been diagnosed with neurological problems believed to be a result of the neglect and abuse she endured at the hands of her mother.  When the court granted Jose full custody of his girls he was residing with his mother and working excessive hours.  He did not have time to work and raise his children and support them financially.  **Ms. JALIL** took charge of the girls and has brought them up as her own.  **Ms. JALIL** remembers that when the girls first moved to her home – they were very timid and would sometimes stand in front of the refrigerator staring in awe at all of the food.  **Ms. JALIL** says that she was heartbroken.  Since then, **Ms. JALIL**

Law Offices of Samuel J. Rabin, Jr., P.A. • 800 Brickell Avenue, Suite 1400, Miami, FL 33131 • Telephone (305) 358-1064

has served as the girls' mother and father.  She describes the girls as her life and states that she would do anything to keep them safe.

At one point, **MS. JALIL** was supporting her two (2) grandchildren, her son who was not making enough money, and her family in Cuba.  Jose, her son, moved to Colorado for better employment opportunities and is presently sending small amounts of money to his mother, the primary caregiver for his two children, her grandchildren, and her family in Cuba.  She takes and picks up the girls from school, takes them to their extra-curricular activities, takes them to doctor appointments, cares for them when they are sick, feeds them, and helps them in any way needed.  She also makes sure that her youngest grandchild receives all the medical attention she requires to live a normal life despite her neurological issues.  This includes monthly doctors' appointments, taking a multitude of medications and receiving afterschool care to help her with her homework.  To the girls, **MS. JALIL** is everything – all they know is their grandmother.  They have absolutely no relationship with their mother and their father presently lives in Colorado.  All of the girls' teachers, doctors and friends know **MS. JALIL** to be their primary caregiver.  **MS. JALIL** is also in charge of the household and has to take care of her "husband" when he visits Miami – out of fear of being left homeless with her two (2) grandchildren.  She also somehow makes the time to be her own children's main emotional as well as financial support and her daughter's babysitter.

**MS. JALIL'S** Achilles' heel is the fact that she never asks for help.  On the contrary, she always says "yes" to her children and supports them in anything that they need even if it means sacrificing her own well-being.  She does so without *ever* complaining and with no strings attached.  To say that **MS. JALIL** does nothing for herself is an understatement.

Law Offices of Samuel J. Rabin, Jr., P.A. • 800 Brickell Avenue, Suite 1400, Miami, FL 33131 • Telephone (305) 358-1064

**MS. JALIL** took on all of the aforementioned responsibilities by herself on the salary of a CNA whose primary responsibility was to bathe elderly patients.  The financial strains imposed on **MS. JALIL** led her to take the misguided but desperate measures that have her before Your Honor today – she received kickbacks for referring some of her patients to home health care providers.  Unfortunately, **MS. JALIL** found herself alone and drowning – her judgment became clouded by desperation.

Despite everything that she has been going through with the instant case, she still refuses to ask for help.  She did not want her children to go to her change of plea hearing and keeps her appointments with the undersigned a secret.  She stated that she does not want her children to be "burdened" or "worried" by her mistakes.  Prior to her presentence investigation report (hereinafter "PSR") interview she fell while cleaning her house.  She did not call anyone for help even though she was (and still is) in excruciating pain.  It was later determined that she had fractured 70% of one vertebrate in her spine, which if left untreated, could leave her paralyzed.  However, she has not sought the medical attention that she needs because she states that her priority is the well-being of her grandchildren who need her.  She recently chose to travel to Colorado (with this Court's permission) with her grandchildren, instead of taking care of her fractured back, because her son wanted to spend the holidays with them and **MS. JALIL** did not want them traveling alone on their first trip on an airplane.

**MS. JALIL** has lived her entire life for others.  Her *only* concern throughout this case has been her grandchildren.  She is scared because they have no one to properly take care of them.  She is also worried because the girls are very sensitive due to the abuse that they suffered when they were living with their mother, therefore, she fears that it will

Law Offices of Samuel J. Rabin, Jr., P.A. • 800 Brickell Avenue, Suite 1400, Miami, FL 33131 • Telephone (305) 358-1064

be very traumatic for them to have their entire world flipped upside down should she be incarcerated.  *See United States v. Johnson*, 964 F.2d 124, 129 (2nd Cir. 1992) (The rationale for a downward departure here is not that Johnson's family circumstances decrease her culpability, but that we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing); *See also United States v. Faria*, 161 F.3d 761, 762 (2nd Cir. 1998) ("[W]e have upheld downward departures based on family circumstances where the family was uniquely dependent on the defendant's ability to maintain existing financial and emotional commitments"); *United States v. Cacho*, 951 F.2d 308 (1992) (The Eleventh Circuit concluded that a downward departure is appropriate when there are unique or extraordinary circumstances).

## II.
## NATURE OF THE OFFENSE

**MS. JALIL** pled guilty to count ten (10) of the indictment which charges her with conspiracy to defraud the United States by paying and receiving healthcare kickbacks in violation of 18 U.S.C. § 371.  **MS. JALIL** admits and accepts full responsibility to receiving illegal kickbacks for referring patients to the home health agencies listed in the factual proffer – and for that she is extremely ashamed and remorseful.  However, **MS. JALIL** would only keep approximately 10 to 20 percent of the kickbacks she received for her referrals.  The remaining 80 to 90 percent would go to the patient referred and, at times, the doctor who made the referral.  All of the money **MS. JALIL** received was used to support her family.  Furthermore, the patients that **MS. JALIL** referred were patients that she bathed, which she believed met the eligibility requirements for home health care.

### III.
### MS. JALIL'S COOPERATION SHOULD RESULT IN A SIGNIFICANT REDUCTION

In the instant case, **MS. JALIL** chose to forego a trial so that she could admit guilt, accept responsibility, and thereafter cooperate with the government. She always made herself available for cooperation, even if it meant canceling important appointments for her health or rearranging appointments for her grandchildren, to accommodate government agents and prosecutors. Her cooperation was and is timely, honest, and forthright.

### IV.
### MS. JALIL IS A SIXTY-SIX (66) YEAR OLD WITH SERIOUS HEALTH PROBLEMS

**MS. JALIL** believes this Court should consider that at the age of sixty-six (66), and diagnosed with heart problems and a severely fractured back she presents a much lower risk of recidivism than most offenders.[1] Effective November 1, 2011, § 5H1.1 was amended to state that age "may be relevant" as to whether a downward departure should be granted. Under the advisory guidelines, age may be relevant in unusual cases or in combination with other § 3553 factors. In *United States v. Gray*, 453 F.3d 1323 (11th Cir. 2006), the low end of the guidelines was one-hundred and fifty-one (151) months for this child pornography case, however the appellate court held that the district court's sentence of seventy-two (72) months was reasonable because the defendant was sixty-four (64) years old with medical problems. *See United States v. Hildebrand*, 152 F.3d 756 (8th Cir. 1998) (A departure from a guidelines range of fifty-one (51) to sixty-three (63) months to

---

[1] Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines, at 12, 28 (2004) www.ussc.gov/punlicat/Recidivism_General.pdf. ("Recidivism rates decline relatively consistently as age increases," from 35.5% under age 21 to 9.5% over 50.)

probation and six (6) months of home detention was affirmed because defendant was seventy (70) years old with medical problems); *see also United States v. Carter*, 538 F.3d 784 (7th Cir. 2008) (The guideline range was eighty-seven (87) to one-hundred and eight (108) months and the court affirmed a twenty-four (24) month sentence, in part, because the defendant was sixty-one (61) years old and age is relevant to risk of recidivism and "the likelihood of recidivism is a proper sentencing consideration"); *United States v. Lucania,* 379 F.Supp.2d 288, 297 (E.D.N.Y. 2005) (The district judge found that "Post-*Booker* courts have noted that recidivism is markedly lower for older defendants"); *United States v. Nellum,* 2005 WL 300073 (N.D. Ind. Feb. 3, 2005) (unpub.) (The court cited lower recidivism rates for older defendants and granted a downward departure).  In this case, **MS. JALIL** asks this Court to consider her age and ailments as a sentencing factor supporting a variance under 18 U.S.C. § 3553 in fashioning a reasonable but not greater than necessary sentence.

     **MS. JALIL** suffers from severe hypertension that is causing her to retain fluid, which is a sign of congestive heart failure.  For her heart condition she takes Metoprolol and Benicar, to regulate her blood pressure, and Furosemide, a strong diuretic to help with the fluid retention.  As stated above, **MS. JALIL** recently fractured 70 percent of her lumbar vertebra/sciatic lumbaglia, which if left untreated could lead to paralysis.

     The "Silver Tsunami" and Sentencing - Age and Health as Mitigating Factors, by Evan A. Jenness and published in the September/October 2013 *Champion*, discusses the issue of elderly and infirmed inmates.  What is "old" when it comes to sentencing a defendant to prison is not the equivalent of "old" in the outside world.  The medium age

of a federal defendant at sentencing is 34.[2]  The National Institute of Corrections defines prisoners 50 and older as "elderly" and "aging,"[3] and 15 states specifically define an "older" inmate as 50 or older.[4]  Only 10.8 % of all federal defendants are over 50.[5]  **MS. JALIL** is sixty-six (66) years old.

Pursuant to the most recent amendment (739) to § 5H1.4, a defendant's physical condition, on its own, or in combination with other offender characteristics, such as age and the length of any expected sentence, may be considered as sentencing factors in fashioning a reasonable but not greater than necessary sentence.  **MS. JALIL** asks that her age and health be considered as sentencing factors under 18 U.S.C. § 3553.

## CONCLUSION

We recognize that it is no easy task for this Court to impose a sentence on a defendant, especially a defendant like **MS. JALIL**.  **MS. JALIL'S** history and characteristics present very strong reasons for this Court to impose a substantial variance in this case. **MS. JALIL** is a first-time, non-violent offender, who presents no risk to re-offend.  She is also the sole caretaker for her two young granddaughters.

---

[2]     Sourcebook, Table 6

[3]     Dr. Joann B. Morton, An Administrative Review of the Older Inmate, USDOJ, National Institute of Corrections, 4 (1992)

[4]     Old Behind Bars, at 17

[5]     Sourcebook, Table 6

WHEREFORE, **MS. JALIL**, through counsel, respectfully requests that this Honorable Court take into consideration the factors herein when fashioning a sentence that is both reasonable but not greater than necessary.

Respectfully submitted,

**SAMUEL J. RABIN, JR., P.A.**
800 Brickell Avenue
Suite 1400
Miami, FL 33131•2808
Tel: 305•358•1064
Fax: 305•372•1644
Email: sjr@miamilawyer.com

*s/ Andrea Lopez*

ANDREA LOPEZ
Florida Bar № 109512

*s/ Samuel J. Rabin, Jr.*

SAMUEL J. RABIN, JR.
Florida Bar № 273831

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 29th day of December 2016, a true and correct copy of the foregoing was furnished via the CM/ECF system to all parties designated to receive the electronic filings in this cause.

*s/ Andrea Lopez*

ANDREA LOPEZ

*s/ Samuel J. Rabin, Jr.*

SAMUEL J. RABIN, JR.
